**AMERICAN MUTUAL LIABILITY INSURANCE COMPANY, a Massachusetts corporation, Plaintiff,**

v.

**Stephen KOSAN, an individual and Ritenour & Bradley Insurance Agency, Inc., a Pennsylvania corporation, Defendants.**

Civ. A. No. 84–589.

United States District Court,
W.D. Pennsylvania.

May 21, 1986.

Robert S. Grigsby, Pittsburgh, Pa., for plaintiff.

William L. Garvin, McKeesport, Pa., for defendants.

## OPINION

GERALD J. WEBER, District Judge.

This is an action brought by an insurance company against a former employee to enforce non-competition and trade secret protection provisions in an employment contract. Additional claims were made against plaintiff's former employee, Kosan, and Kosan's new employer, Ritenour & Bradley Insurance Agency, Inc. alleging tortious interference with contractual relations as well as with prospective contractual relations, conspiracy and unfair competition. Plaintiff seeks injunctive relief, compensatory and punitive damages. After an evidentiary hearing, this court earlier granted injunctive relief against defendant Kosan according to the terms of the employment contract. The court also granted plaintiff's earlier motion to dismiss defendant's counterclaim for wrongful discharge. Now before the court is plaintiff's motion for summary judgment which addresses Count II, the breach of contract claim against Kosan. In support thereof plaintiff has supplied the court with copious evidentiary materials including transcripts of the testimony of plaintiff's prior customers who are now customers of Ritenour & Bradley, and the deposition testimony of defendants John Ritenour and Stephen Ko-san. In opposition, defendant Kosan has filed an answer and affidavit which asserts that he did not violate the Employment Agreement. Thus the motion is ready for determination by the court.

In order to succeed with a summary judgment motion, plaintiff must establish that there exists no dispute as to any material issue of fact, and that it is entitled to judgment as a matter of law. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Every favorable factual inference is to be drawn to the benefit of the non-moving party. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). However, when confronted by clear evidentiary material in affidavit or other admissible form, defendant may not rest on mere allegation, but must come forward with some evidence of his own to establish a material issue of fact. *Tilden Financial Corp. v. Palo Tire Service, Inc.*, 596 F.2d 604 (3d Cir.1979).

Kosan first asserts that there exists here a purely factual issue and therefore the matter is not susceptible to summary judgment. We disagree. We cannot discern any new or contradictory facts in defendant Kosan's Affidavit. Kosan does not say that his actions varied in any way from the facts presented in the evidence submitted by the plaintiff. Rather Kosan presents us with his conclusions that nothing he did violated the contract. Kosan argues that the inferences raised by his Affidavit are sufficient to give rise to a factual issue precluding summary disposition. However, conflicting conclusions as to the interpretation of a written contract which is clear and unambiguous as to its terms will not create a material issue of fact to bar disposition by summary judgment. *County of Erie v. American States Insurance Co.*, 573 F.Supp. 479 (W.D.Pa. 1983), *affd.*, 745 F.2d 45 (3d Cir.1984). Such interpretation is a matter of law for the court to decide. Whether or not Kosan's activities constitute violations of his Employment Agreement as a matter of law is the question now before the court and the only one which we decide at this time.

Paragraphs 3 and 5 of the Employment Agreement set forth the details of the trade secret protection and non-competition clauses, as follows:

3.   Employee agrees that all rights created in the expiration, rights of renewal and good will of the business procured by Employee or assigned to him for service during the term of employment shall, as between Company and Employee, be and remain the exclusive property of Company and, in recognition of the fact that he will have access to confidential information and materials which, if communicated would or could result in irreparable damage to Company, further agrees that all such information and materials, whether made by Employee or not, including, but not limited to all correspondence, applications, expiration dates, forms, manuals, prospects, documents and papers, are regarded as confidential in nature and will remain the exclusive property of Company and will forthwith be delivered to Company by Employee upon termination of this Agreement and that upon such termination *he will in no way disclose or use, either directly or indirectly, any such information or materials.*

. . . . .

5.   Employee agrees that for a period of 18 months following the termination of this Agreement or should Company find it necessary to institute Court action against Employee to enforce any provision of this Agreement, for one year after the date Company is granted relief, whichever period is longer, *he will not and will not attempt to, either directly or indirectly:*

(a) *Be licensed or act as an agent, advisor, solicitor, salesman, sales representative, district manager, sales manager, group specialist, special agent, or broker for any other company, firm, agency or other person or organization engaged in the Fire, Casualty, Accident and Health or Life Insurance business* or busi-nesses *or be employed or act in any other capacity whereby he will be involved in the sale* of Fire, Casualty, Accident and Health or Life insurance *or involved in contacting customers,* prospective customers, policyholders or prospective policyholders *for the purpose of writing or selling such insurance within 50 miles* of any office to which Employee was . . . assigned. . . .

(b) *By himself or through others procure, solicit, accept, refer or encourage the discontinuance of policies of, applications for or inquiries about insurance* from:

1.   Any person, firm, corporation or association which, at the time of termination was insured by a policy or policies issued by Company or any of its affiliated companies and which was serviced by, through or from any office to which Employee was assigned on Company's Personnel Recommendation Form (Form 0433 or any subsequent form which may replace said Form 0433) at any time during the 18 months immediately preceding the termination or

2.   any person, firm, corporation or association which at the time of termination was insured by Company or any of its affiliated companies under a policy or policies, sold or serviced by Employee.

. . . (Emphasis added)

*See* Exhibit A, Plaintiff's Complaint.

The uncontradicted evidence of record indicates that after signing the Employment Agreement under consideration herein, Kosan worked for plaintiff American Mutual for approximately ten years. In this employment, Kosan serviced American Mutual policyholders and developed significant sales contacts, so that, by 1983, he had a "book" of approximately 75 policyholders. During this employment, Kosan worked exclusively with worker's compensation accounts. On January 4, 1983, Kosan's employment relationship with American Mutual was terminated.

Kosan began work for Ritenour & Bradley Insurance Agency late January, or early February 1983. While in Ritenour's employ, Kosan admitted discussing workmen's compensation insurance sales with Ritenour, and giving Ritenour suggestions in connection thereto. (Kosan deposition, p. 56; also Ritenour deposition, p. 16).

By January, 1984, Ritenour & Bradley had successfully solicited the following accounts which previously had been serviced by American Mutual's Pittsburgh Office, and in most instances by Kosan himself prior to his termination:

1) Plaza Restaurant

2) Charlie J's Restaurant

3) Elbow Room

4) Mount View Medical Facilities/Briarcliff Pavilion

5) Scotty's Red Barn, Inc.

6) Lemon Tree Restaurant

Kosan admitted to having contact with these accounts, and all of these customers, who testified at the preliminary injunction hearing, knew of Kosan's employment with Ritenour & Bradley. (Preliminary Injunction hearing transcript.) Ritenour was unable at his deposition to recall how he was put in contact with the owners of most of these facilities. (Ritenour deposition, p. 91). But his testimony at the preliminary injunction hearing appears to indicate that Kosan brought the Workmen's Compensation account for Charlie J's to Ritenour's attention. (Preliminary Injunction Hearing, p. 121). At least one of the customers above-listed, who testified at the preliminary injunction hearing, indicated that Kosan was still servicing the transferred accounts in the same manner that he had when he handled the accounts for American Mutual. Documentary evidence (Plaintiff's Exhibit 4 at Preliminary Injunction Hearing) shows endorsement requests and other correspondence regarding insurance accounts being directed to Kosan at Ridenour & Bradley from customers and other brokers. (Preliminary Injunction Hearing, pp. 1–48). In addition, John Ritenour admitted that while Kosan was in his employ, Kosan "did quotes, took quotes, information over the phone for auto insurance, filled out applications, requested endorsements." (Ritenour deposition, p. 16). He also admitted that Kosan "would work on any policies I asked him to work on" and that he "occasionally" worked on workman's compensation policies. (Ritenour deposition, p. 16). Ritenour admitted that it was "probably" Kosan's handwriting on the application for the workman's compensation policy submitted by Ritenour & Bradley for Mount View Medical Facility and Briarcliff Pavilion. (Ritenour deposition, p. 94). Kosan admitted that he has "serviced a lot of (Ritenour's) existing accounts" and "used some of (his own) expertise in the insurance business." (Preliminary Injunction Hearing transcript, p. 106). Kosan admitted that he had contact with each of the transferred accounts (identified above) in the course of his servicing contracts for Ritenour & Bradley. (Preliminary Injunction Hearing transcript, p. 109). "They have called me on the phone when I am sitting in the office. I've got phone calls even at home asking me questions." (Preliminary Injunction Hearing transcript, p. 109). "I advise people that have a lot of different policies on my own, you know, I run across a lot of people and they ask me questions about insurance and I give them my personal opinion." (Preliminary Injunction Hearing transcript, p. 111). "In some instances, I tell them to see John, yes." (Preliminary Injunction Hearing transcript, p. 111).

■ Defendant Kosan maintains that since he never asked anyone to change their policy to Ritenour & Bradley, he did not actively "solicit" insurance business and therefore did not breach his agreement. We disagree. Kosan agreed that he would not directly or indirectly: (a) be licensed to act as an agent, advisor, solicitor, salesman, or sales representative for any other insurance firm in the same line of business located within 50 miles of his former employer's office, (b) procure, solicit, accept, refer or encourage discontinuance of policies or applications for insurance from any person which was insured by

American Mutual and serviced by the Pittsburgh Office to which Kosan was assigned during the 18 months prior to his termination. We have no doubt that the evidence noted herein, as well as the more extensive evidence of record, establishes: (1) that Kosan did indeed act as an advisor for the Ritenour firm, which engaged in the same lines of business as American Mutual and was within 50 miles of American Mutual's Pittsburgh Office; (2) that Kosan referred and/or accepted applications for insurance from former customers and persons previously serviced and insured through American Mutual's Pittsburgh Office. These actions as a matter of law violate Kosan's Employment Agreement and establish his liability under Count II for breach of his Employment Agreement.[1]

This conclusion leads us to the question of damages. Plaintiff calls our attention to paragraph 6 of the Employment Agreement which contains a liquidated damages clause [2] under which American Mutual is entitled to a judgment against Kosan for 25% of the annual premiums for the six accounts listed in this opinion. Based on

American Mutual's last earned premium on the accounts at issue (amounting to $113,790 for 1982) plaintiff has calculated this figure to be $28,250.00.[3] The clause also provides for $500.00 in attorneys fees and expenses to be paid by Kosan. In addition, plaintiff asks for prejudgment interest running from the date of the breach, or February 1, 1983.

Defendant argues that the figures on which plaintiff based its calculations of the annual premiums have "no basis in fact for the years 1983 and 1984" since the quotes for those years were substantially lower due to a new system of competitive bidding in Pennsylvania for compensation policies effective in early 1983. (*See* Defendant's Brief, p. 2). The problem with this argument is that defendant does not present us with any evidence to support it. Testimony at the preliminary hearing established that a new system of bidding was put in effect, but it did not establish that this system *lowered* the quotes or affected them in any way. (Preliminary Injunction Hearing Testimony; Cross Examination of Mr. Keefe by Mr. Garvin). Furthermore we note that during discovery plaintiff had requested

---

1. We earlier found preliminarily that the provisions in the Employment Agreement were reasonable in time and geographic area. (Memorandum Opinion and Preliminary Injunction, April 5, 1984, 582 F.Supp. 269, p. 3). Defendants have provided us with no new or contradictory information which would induce us to reject our earlier opinion.

2. Paragraph 6 of the Employment contract reads as follows:

> 6. In the event of any breach or violation by Employee of this Agreement, Company shall have the right to enforce specific performance of all Employee's agreements contained herein. Employee also agrees to pay damages to Company on account of such breach or violation, and agrees that the appropriate and proper *measure of such damages shall be 25% of the annual premiums written, accepted, transferred, replaced, sold or bound by Employee contrary to this Agreement* (such figure representing a fair approximation of the average country-wide cost to Company and its affiliates of acquiring and servicing policyholders, expressed as a percentage of premium generated). Employee also agreed that in the event Court action is instituted by Company against him for violation of any of the provisions contained herein he will pay to Company, in addition to any costs and disbursements provided by law, the sum of Five Hundred ($500.00) Dollars, in lawful money, for attorneys' fees and other expenses of litigation. The rights and remedies given to or reserved by Company hereunder shall be construed and held to be cumulative and not exclusive of any other rights or remedies available to Company. (Emphasis added).

3. *See* Plaintiff's Memorandum of Law, pp. 7 and 11. We calculate 25% of $113,790 to be $28,447.50 rather than the figure that plaintiff arrives at.

Defendant's argument does not challenge the individual figures but assumes they are correct for the year stated.

Therefore we assume that a simple multiplication error took place in obtaining the figure representing 25% of the total earned premiums for the accounts in question in 1982, and we will use the $28,447.50 figure.

Defendant may move for a modification of the amount of judgment if he can provide the court with evidentiary materials which show that the actual 1982 earned premiums are different from those which plaintiff has submitted.

that John Ritenour bring documentation regarding the actual quotes for the accounts in question for 1983, along with other business documents, to his continued deposition in May of 1984. Ritenour appeared without the documents and his counsel objected to their production. To our knowledge these documents have not been produced. Neither do we have any record of a motion to compel being filed.

■ Defendant Ritenour has in his possession actual figures for the premiums paid to Ritenour & Bradley for 1983, which have not been provided to the court and which may support defendants' arguments presented in opposition to this motion for summary judgment. We do not believe that defendants' failure to produce this information should operate to their benefit. We believe that in lieu of the production of such information, plaintiff's calculations based on their actual 1982 figures which are supported by documentary evidence entered as exhibits in the preliminary injunction hearing are sufficiently certain to afford a reasonable basis in fact to calculate "transferred premiums", and may fairly be used to determine the amount owed by defendant Kosan for his breach of the employment agreement.

■ The only remaining issue, then, is plaintiff's request for prejudgment interest. Plaintiff offers no rationale to justify its request, and aside from a general attack on damages, defendant does not address this issue. The Third Circuit has held that federal courts in diversity cases should apply state law with respect to prejudgment interest. *Jarvis v. Johnson*, 688 F.2d 740, 746 (3d Cir.1982). However since the basis for awarding prejudgment interest, in the absence of a specific statutory provision, is the same under federal and Pennsylvania law, *Pension Benefit Guaranty Corp. v. Greene*, 570 F.Supp. 1483 (W.D.Pa.1983), *affd*, 727 F.2d 1100 (3d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984), this distinction is not crucial in our case. Under either federal or Pennsylvania law, an award of prejudgment interest is not a matter of right but

may be granted at the court's discretion if equity favors it. *Id.* The four basic factors to consider are: (1) whether the claimant has been less than diligent in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether an award would be compensatory; and (4) whether countervailing equitable considerations militate against such a surcharge. *Id.*, at 1503. Circumstances wherein there is a failure to pay a liquidated sum, due at a fixed date, and the debtor is in absolute default would appear to present the strongest case for such an award. *See Peterson v. Crown Financial Corp.*, 661 F.2d 287, 294 (3d Cir.1981); *Girard Bank v. John Hancock Mutual Life Insurance Co.*, 524 F.Supp. 884 (E.D.Pa.1981).

■ We do not believe that an award of prejudgment interest is warranted in this case. While there is no doubt that plaintiff diligently prosecuted this action, we cannot see how defendant has been unjustly enriched. Defendant was subjected to an injunction compelling him to comply with the terms of the Agreement. Furthermore we do not believe such an award is necessary to fully compensate the plaintiff since there exists a liquidated damages provision which does not mention prejudgment interest and of which plaintiff is getting the full benefit. Furthermore, the evidence before us indicates that defendant Kosan's remuneration for his part-time employment with Ritenour was on an hourly basis, and he evidently did not himself benefit from any transferred premiums. We believe plaintiff is getting the remedy it agreed to in the eventuality of a breach, and we decline to award prejudgment interest.

An appropriate order will issue.

### ORDER

NOW this 21st day of May, 1986, in accord with the accompanying opinion, IT IS ORDERED that

1. Plaintiff's Motion for Summary Judgment is GRANTED, and liability as to Count II (breach of contract) is established

against defendant Kosan only in favor of plaintiff.

2. Judgment is ENTERED in the amount of $28,947.50.

3. Trial of the remaining issues will be held on or after *Tuesday, June 10, 1986, at 10:00 A.M.*